FILED
IN CLERK'S OFFICE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
WESTERN SECTION 2000 MAY 31  P 1: 09

CRIMINAL NO. 98-30044-MAP

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| Plaintiff ) | |
| ) | **DOCKETED** |
| vs. ) | |
| ) | |
| KRISTEN GILBERT, ) | |
| Defendant ) | |

### DEFENDANT, KRISTEN GILBERT'S, MEMORANDUM IN REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANT, KRISTEN GILBERT'S, MOTION TO EXCLUDE TESTIMONY OF DR. RIEDERS & WILLIAM VICKERY

### The Best Equipment Cannot Remedy Sloppy, Unscientific Work

The fact that NMS used HPLC-MS/MS in its tests cannot overcome the fact that NMS did

not use generally accepted cross-checks of its results.  Dr. Alan Wu, an expert upon whom the

Government relies, stressed in "Minimal Standards for the Performance and Interpretation of

Toxicology Tests in Legal Proceedings." *Journal of Forensic Science* 1999:  44 (3) 516, the

consequences of erroneously produced or interpreted test results in criminal and civil cases.  Wu

et als. urge a conservative approach in interpretation of test results.  HPLC-MS/MS can have

"limitations depending on the mode of operation, the experience of the operator performing the

test, and the toxicologist interpreting the result ... data can be manipulated to arrive at an

erroneous conclusion."  *Id.* at 521.[1] The failure of NMS to use generally accepted cross-checks

permits mistakes and manipulation.

---

[1] The authors presented four cases where the standard tenets of sound forensic practice were not adhered to. Ironically, at least one of them (Case No. 1), was a presentation by Dr. Rieders. *State v. Kelley*, 199 Conn. Super. Lexis 2105 (July 29, 1997).

## The Government is Trying to Have it Both Ways.

When it suits their purposes, the prosecutors claim that NMS test results were the product of accurate measurements of metanephrine and normetanephrine levels, and that this was a quantitative test. When, however, the methodology is challenged, the Government retorts that the test was merely qualitative, and that safeguards and checks that would normally be employed in scientific toxicology testing were not necessary.

Attempts to justify the failure of NMS to use appropriate calibration techniques:

> ... multiple testing of samples is not necessary when the analysis being conducted is qualitative rather than quantitative. Dr. Rieders specifically testified that the analysis he conducted was not quantitative. At one point, he explained that he only wanted to know if there was a little, a lot, or a whole boatload of metanephrine." (Government Response at 25).

In response to the challenge to the manner in and location from which tissue samples were drawn, the Government stated that:

> Where, as here, the only question is whether the compound exists in sufficient quantities to be detected at the time of exhumation and autopsy, then the testing of peripheral tissue samples is not necessary. (Government Response at 28).

In reality, as shown in his grand jury testimony, attached as an exhibit to Defendant's Motion to Dismiss, and in Government exhibits at the *Daubert* hearing, Dr. Rieders consistently relied upon his ability to quantitate the amount of metanephrine and normetanephrine allegedly found in the serum and tissue of the embalmed, exhumed patients as the basis of his opinions.

NMS provided data which clearly and unequivocally claimed that all of the work on the cases was being represented as quantitative (including the reports to Agent Sackman concerning Messrs. Hudon and Skwira, and the handwritten Jagodowski "report," along with the back – of the – envelope notes on Mr. Cutting), all of which were introduced at the *Daubert* hearing. The Government persisted in this claim right to the eve of the *Daubert* hearing. During the hearing, Dr. Rieders recharacterized his techniques as "qualitative," designed to determine merely the

193421

presence or absence of chemical compounds. The attempt to try to backtrack on the stand and suggest to the Court that they were always doing qualitative work is absurd and, frankly, insulting.

Yet, despite this, the Government feels free to cite levels of metanephrine allegedly found in two of the deceased patients as having been quantified, in order to rebut the effect of authoritative scientific literature concerning elevated, endogenous metanephrine levels. (Government Response at 13).

In reality, this leaves this Court with hodge-podge of opinions based upon a test of questionable pedigree which the Government tries to characterize as qualitative "plus." It is hardly likely that any court should, or any scientific journal would, accept a purported determination stated in terms of "a little, a lot, or a whole boatload."

If, at the end of the day, all Dr. Rieders is left to say is that his testing "found" metanephrine in these alleged victims, such testimony is of no use to the fact finder.[2] Messrs. Hudon and Jagodowski both received resuscitative epinephrine during their codes due to cardiac arrest. All the patients were chronically and acutely ill and were in the ICU prior to their cardiac incidents. Both Messrs. Cutting and Skwira should also reasonably be expected to have had elevated levels of metanephrine in them at the times of their deaths. *See Wortsman, et als*, "Adrenomedullary Response to Maximal Stress in Humans. *American Journal of Medicine* 77, 779, 780-783 (November, 1984).

---

[2] Defendant has already shown that the testing methodology was optimized towards metanephrine at the expense of normetanephrine. (Defendant's Memo at 11-12). *See*, also, the grand jury testimony of Dr. Rieders, attached an exhibit to Defendant's Motion to Dismiss Indictment, at Page 24 ("…the conditions were directed to metanephrine."). NMS offered no proof that metanephrine and normetanephrine have the same rate of decomposition over the lengthy period and conditions of interment. They thus have no sound, scientific basis for concluding that an elevated metanephrine to normetanephrine "ratio" proves endogenous epinephrine administration without proof of the ability to perform quantitative measurements which are validated and which are the result of precise, quantitative methodology.

**Judges Must "Distinguish Between Real and Courtroom Science...to Make Sure that When Scientists Testify in Court, They Adhere to the Same Standards of Intellectual Rigor That are Demanded in Their Professional Work"**
*(Rosen v. Ciba-Geigy Corp.*, 780 F.3d 316, 318 (7th Cir. 1996), Opinion by Posner, CJ)

In an effort to buttress the conclusions drawn by Dr. Rieders concerning his testing of the embalmed, exhumed tissue in this case, the Government presented testimony from him and Mr. Vickery that they had begun testing other embalmed, exhumed tissue for the presence of metanephrine and had also conducted an experiment on exhumed tissue. Furthermore, there was testimony offered concerning some "control" testing within the last year on blind specimens sent by Dr. Alan Wu. These after-the-fact efforts, which are more in the nature of home science projects than actual validating scientific experiments, were performed in the exact reverse order required by the scientific method – the first time this type of testing was ever done was for this litigation. Once the conclusions were drawn, undocumented additional, confirmatory testing, most of it anecdotal in nature, was then performed by the very lab and individuals whose methods are under fire. The military calls this kind of approach "Ready-Fire-Aim."

Certain facts cannot be disputed:

(1) Both the initial and subsequent "confirmatory" testing identified grew out of this litigation rather than from methodologies and studies undertaken prior to litigation. This is a factor which the Ninth Circuit thought should be added to the index of suspicion post-*Daubert*. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995) (on remand).

(2) Mr. Vickery's training and experience with the equipment and methodology began with this litigation, in or about December, 1997.

(3) NMS never prepared any sort of written bench manual or protocol until at least September, 1998, after the bulk of the testing had been completed. Contrary to the claim on page

29 of the Government's Response. Mr. Vickery admitted that the procedure was "experimental" up to that point.

(4) Once it was finally prepared, the bench protocol still lacked key information on sample handling. The Government minimizes the significance of omission by claiming:

> "...the analyst following the protocol is expected to use his or her professional judgment with respect to routine issues such as sample quantity. Mr. Vickery testified that he and any other competent analyst would reserve the right to make appropriate, minor changes in the protocol to account for degradation and the quality of the sample. Moreover, even assuming that Gilbert's criticism is well-founded, it is not relevant because only one analyst, Mr. Vickery, conducted the tests at issue here. Given the fact that Mr. Vickery developed the method, there can be no doubt that he was completely familiar with the procedure."

To anyone with even a minimal familiarity with the scientific method, this stands most of the basic principles of it on their head. The whole point is that another professional should be able to pick up a bench protocol and reproduce every step taken during a particular test without having to resort to any "secret ingredient" known only to the author of the recipe.

(5) Dr. Rieders claimed that he and Mr. Vickery have tested other exhumed, embalmed tissue where there was no "pedigree" of epinephrine administration prior to death and were unable to detect metanephrine or normetanephrine. There was no documentation presented showing any of the circumstances of death (i.e., whether any of the subjects had had cardiac arrests), the amount of time of interment, the test results, etc. What the Court was given, instead, was the anecdotal "ipse dixit" testimony of Dr. Rieders. Even after the Government's Response, the fact remains that nobody but NMS has tested embalmed, exhumed tissue for the presence of metanephrine and normetanephrine.

(6) NMS did not set or determine a standard of acceptability for error rate, extraction rate, or standard deviation before it conducted any of its tests. The Government defends this omission by asking "...how a forensic toxicologist possibly can set pre-test standards of acceptability for

193421

unique specimens whose results may vary from specimen to specimen and within the same tissue specimen[?]."

The very question supplies the answer: if the toxicologist cannot set such standards, then any tests will be inherently unreliable.

### Despite the Government's Artful Dodging, it Must Admit the Lack of Scientific Literature or Other Knowledge About Postmortem Redistribution or Hydrolysis of Metanephrine and Normetanephrine in Serum or Tissue. Hence, the NMS Test Results are Meaningless.

As explained in Defendant's Memorandum, whatever literature exists about levels of these metabolites in the blood and urine of living persons at rest does not suffice as a basis for an assumption about postmortem tissue. Dr. Rieders conceded that there were no studies regarding the postmortem redistribution of metanephrine or normetanephrine exist. Indeed, the Government essentially suggests that the effects of postmortem redistribution (a subject on which Dr. Jones is an acknowledged expert) cannot be determined because:

"...exhumed, embalmed tissues are very unique specimens that retain drugs differently, decompose different, and have different chemical properties...The uniqueness of exhumed, embalmed tissue specimens will produce variability in testing results, even within the same exhumed, embalmed tissue specimens, such as a liver or kidney." (Government Response at p. 2).

Because of this, the Government asserts, the Court must instead rely on the ipse dixit of Dr. Rieders. Relying on the *ipse dixit* of the expert, rather than on sound, proven scientific conclusions is precisely what the Supreme Court rejected in *Joiner*. As Chief Judge Posner of the Seventh Circuit has noted, "...the courtroom is not the place for scientific guesswork, even of the most inspired sort. Law lags science; it does not lead it." *Rosen v. Ciba-Geigy Corp.*, 780 F.3d 316, 319 (7th Cir. 1996).

Yet, that is what the Government is asking this Court to do here -- to accept "unscientific speculation offered by a genuine scientist." *Id.* at 318. The audacity of the speculation is even more pronounced in light of the fact that:

193421

•The stability of MTN, either in the dominant form as sulfate conjugate or as the free drug, has never been established in tissue.

•The fate of epinephrine in the immediate postmortem phase has not been studied.

•Postmortem redistribution has not been studied for epinephrine or normetanephrine and their metabolites.

•The effect of the disruption of endogenous reservoirs, either mechanically during embalming or during decomposition, has not been studied[3].

•The effect of bacteria, yeast and insects has not been studied.

•The effect of enzyme activity in the immediate postmortem stage has not been studied.

•The effect of embalming preparations on the stability of epinephrine, norepinephrine, metanephrine and normetanephrine is unknown.

Several additional points need to be made.

First, on Pages 16-18 of its Response, the Government persists in presenting Dr. Rieders' speculation concerning the possibility that Messrs. Skwira, Hudon and Jagodowski somehow had lost the ability to metabolize and excrete. The Government also suggests, as did Dr. Rieders that an unauthorized injection of epinephrine, which precipitated their codes, also managed to shut down their circulation. As has already been addressed in Defendant's Memorandum, no evidence was offered by the Government to support these propositions except for the speculation of Dr. Rieders. Dr. Rieders is not qualified to "... interpret clinical symptoms exhibited by patients and bring to bear medical experience to formulate a diagnosis." *Wirtz v. Northrop Corp.*, 110 F.3d 508, 512 (7th Cir. 1997) (toxicologist not permitted to offer expert opinion

---

[3] Contrary to what the Government claims in its Response at Page 15, Note 3, ninety-one percent of plasma metanephrine is derived from the adrenal glands. *Eisenhofer, et als.*, Plasma Metadrenalines:  Do They Provide (Footnote continued on next page).

applying principles of toxicology to proximate causation issues involving clinical determinations). Contrary to the Government's assertions, defendant did not rely on Dr. Mozayani as a clinician to render a clinical opinion. Rather, she merely reported what she had read in Mr. Skwira's medical record (as summarized in part in Exhibit C), which demonstrated that he was excreting without any problem while at Baystate Medical Center. It was the evidence presented by NMS through its autopsy toxicology screen that established that Mr. Skwira was metabolizing the pain medications being given to him. See Page 9, Defendant's Memorandum.

The Government again attempts to gloss over the deficiencies in the use of single standard addition by referring to its Exhibit A, the SOFT/AAFS draft guidelines. While the Government agrees that the use of a suitable internal standard is recommended and that it is the preferable method, the Government suggests that these guidelines somehow validate the use by NMS of a single-point standard addition. A review of Section 8.3, regarding standard additions, demonstrates that it should only be used when the testing laboratory is unable to obtain a similar matrix for preparation of reliable calibrators and controls. The methodology recommended is clearly multiple-point standard addition in which "known amounts of analytes are added to specimen aliquots and quantitation performed by comparing the proportional response of the fortified aliquots with that of the unknown specimen." This clearly contemplates use of multiple additions, to calibrate the amount of substance in the unknown sample. The use of only one addition lends itself to "salting the mine." That is, the operator can put in more than is stated, either accidentally or on purpose, and will then "find" the excess amount put in. Without multiple point addition, there is no check or balance. In addition, as pointed out, the internal

---

Useful Information About Sympathoadrenal Function and Catecholamine Metabolism?, Clinical Science (1995), (Footnote continued on next page).

193421

standard could have been used in this case because deuterated metanephrine and normetanephrine were available or could be manufactured. Almost all the articles cited by the Government in its initial submission used deuterated metabolites or made it from a recipe provided in one of the articles. *See,* Extractive Acylation and Mass. Spectrometric Assay of 3-Methoxytyramine, Normetanephrine, and Metanephrine in Cerebrospinal Fluid, Beck and Faull, Analytic Biochemistry 149, 492, 494 (1985). (Tab G to Government's Brief).

Finally, the idea that NMS did not do multiple point standard addition in order to preserve specimens is questionable – they had the entire corpse with "amazingly intact" organs. Defendant also points out that, apparently, there are enough specimens available to turn over to the FBI crime lab for confirmatory testing, as set forth on Pages 30-31 of the Government's Response. This is yet another instance of behind-closed-doors testing, since defendant has been informed that the FBI lab will not allow observation by her experts of the confirmation testing when, and if, it is done.

For all these reasons, defendant requests that the Court grant her Motion to Exclude the Testimony of Dr. Rieders and Mr. Vickery.

---

533, 540.

193421

Respectfully submitted.

THE DEFENDANT
KRISTEN GILBERT

By _Harry Miles_

Harry L. Miles, Esq.
77 Pleasant Street
Northampton, MA 01060

_David Hoose_

David Hoose, Esq.
1145 Main Street
Springfield, MA 01103

## CERTIFICATE OF SERVICE

I, Harry Miles, Esq., hereby certify that on this ___26th___ day of May, 2000, I served a copy of the above upon the parties in the action by mailing, postage prepaid, to William M. Welch, II, Assistant United States Attorney, Office of the United States Attorney, Federal Building and Courthouse, 1550 Main Street, Room 310, Springfield, MA 01103.

Subscribed under the penalties of perjury.

_Harry Miles_

Harry Miles, Esq.

193421