UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA

       )
       )
     v.  )  CRIMINAL NO. 98-30044-MAP
       )
       )
KRISTEN GILBERT   )
       )


MEMORANDUM REGARDING DEFENDANT'S MOTION FOR RELIEF FROM
PREJUDICIAL JOINDER OF COUNTS XIV AND XV AND DEFENDANT'S MOTION
TO DISMISS COUNT XV OF THE SUPERCEDING INDICTMENT
(Docket Nos. 157 & 175)

April 11, 2000

PONSOR, D.J.

I. INTRODUCTION

   Kristen Gilbert is charged with murdering four men, and

attempting to murder three others, all of whom were patients

under her care while she was a nurse at the Veterans Affairs

Medical Center (VAMC) in Northampton, Massachusetts.  The

Government has indicated that, if Gilbert is convicted, it will

seek the death penalty.  The murders and attempted murders are

all alleged to have been committed between August 1995 and

February 1996.

   Tacked on to these capital charges are two counts, the first

alleging retaliation against one potential Government witness,

Gilbert's erstwhile paramour James Perrault (Count XIV), and the

second charging obstruction of justice (Count XV) through the phoning of a false bomb threat to the VAMC facility while the investigation was pending.  These two charges arise from actions taken by Gilbert approximately seven months after the last alleged murder.

Defendant has moved to sever the trial of these two counts from the trial of the remaining counts in the indictment.  She also seeks dismissal of Count XV, on the ground that it lacks sufficient evidentiary support as a matter of law.

Because the joinder of Counts XIV and XV would work substantial and unfair prejudice upon the defendant in the trial of the much more serious homicide counts against her, the court will allow the motion to sever.  The defendant's motion to dismiss Count XV will be denied.

It is important to underline at the outset one highly unusual aspect of this case: the fact that a trial addressing all of the conduct underlying the charges in Counts XIV and XV has already occurred.  In 1998 Gilbert was convicted in a trial before me of phoning in the false bomb threat to the VAMC hospital.  Most or all the evidence the Government will likely offer in support of the charges set forth in Counts XIV and XV was presented in the earlier trial.  Having sat on this prior

2

trial, and carrying the responsibility to preside at the far more
serious trial to come, I can say without reservation that a fair
trial on the murder and attempted murder charges would be
impossible if the evidence supporting the retaliation and
obstruction charges were admitted at the same time.  No jury, no
matter how well instructed and diligent, could keep the evidence
related to Counts XIV and XV in its proper context in a joint
trial.  For the reasons stated in more detail below, this is
emphatically not an instance of "garden variety" spillover, or of
evidence which prejudices the defendant merely by tending to
indicate that she committed a crime.  The admission of evidence
relating to the bomb threat and the harassment by the defendant
of her ex-lover Perrault would profoundly and inevitably taint
the jury's consideration of the capital murder charges and
unfairly, and hopelessly, complicate the defense.  For this
reason, the motion to sever must be allowed.

## II.   FACTS AND PROCEDURAL HISTORY

As noted above, in 1998 the defendant was convicted of
making a telephone bomb threat to the VAMC in Northampton,
Massachusetts.  She was sentenced to fifteen months in prison and
three years of supervised release.  The facts underlying the
conviction are summarized in United States v. Gilbert, 181 F.3d

3

152 (1ˢᵗ Cir. 1999)(affirming various rulings of the court and upholding the conviction). Some of the more salient facts that emerged in that trial are as follows.

In September and October of 1995, the defendant, who was married and working as a nurse on the evening shift at the VAMC, became romantically involved with one of the security officers there, James Perrault. In November of 1995 Gilbert left her husband, abandoning their two children, and moved into an apartment in order to pursue the relationship with Perrault.

In February of 1996, Gilbert became one of the targets of a federal criminal investigation into a number of suspicious deaths at the hospital. Investigators photographed the defendant, took handwriting samples and interviewed her estranged husband. Gilbert was upset about the investigation and complained to Perrault about it. Around this time, Gilbert took a leave of absence from the hospital following a workplace injury.

Gilbert's relationship with Perrault soon began going badly. By June of 1996 Perrault tried to end the liaison but relented when Gilbert begged him not to. By August he was again attempting to make his exit, and Gilbert became distraught. Between March and October 1996 Gilbert had a number of psychiatric hospitalizations.

4

In September of 1996 Gilbert learned that Perrault was going to be interviewed by law enforcement officials looking into the deaths at the VAMC. According to the Government's evidence, Gilbert attempted to dissuade Perrault from speaking to those investigators, even to the point of temporarily blocking his car to prevent him from driving to the appointment. This conflict apparently caused the final rift between Gilbert and Perrault.

During September a number of incidents occurred where Perrault's car was vandalized; the vehicle was scratched, spray painted, egged, and air was let out of a tire. Perrault assumed Gilbert was responsible for this.

Later that month, Gilbert began using a toy voice-transformer to make harassing phone calls to Perrault. The calls and messages sometimes had an obscene content and, because of the voice-transformer, also had an eery and unsettling tone. Then, on September 26, 1996, Gilbert, still using the voice-transformer, called in several bomb threats to Perrault while he was working at the VAMC. Hospital personnel responded by evacuating fifty acutely ill patients in wheelchairs and stretchers from the targeted building, which included Ward C, the unit defendant had worked on. No bomb was ever found.

Perrault continued to receive harassing phone calls from

5

Gilbert for the next week or so.  Investigation and a search of
Gilbert's apartment found evidence that she had purchased a toy
"TalkGirl" and "TalkBoy."  It was discovered that these devices
worked by slowing down the speaker's voice, making it lower and
more drawn out.  A Government expert was able to speed up the
pace of Gilbert's recorded threats, thereby removing the audio
disguise, and both Gilbert's husband and a long-time acquaintance
promptly identified Gilbert as the speaker.  This and other
evidence was used by the Government to convict Gilbert at her
1998 trial for making a bomb threat to a federal facility.  See
Gilbert, 181 F.3d at 153-157.

During the bomb threat trial the Government argued that
Gilbert's acts were animated by two motives: a desire to
retaliate against Perrault for rejecting her, and a desire to
obstruct the ongoing investigation and take revenge against
former workmates who, she thought, were providing evidence
against her.

The current charges were returned later in 1998.  The
fifteen-count indictment includes four counts of first degree
murder, six counts of assault with intent to commit murder, three
counts of attempted murder, and the final two counts for
retaliation against a witness and obstruction of justice.  It is

6

puzzling that the Government, having already obtained a

conviction for precisely the conduct charged in Counts XIV and

XV, and with the defendant having served a significant prison

sentence for this conduct, has now chosen to re-prosecute the

same criminal behavior under these new theories.

### III. DISCUSSION

#### A.   Severance under Rule 14

Even if offenses are properly joined under FED. R. CRIM. P.

8(a)[1], they may still be severed under FED. R. CRIM. P. 14[2] where

---

[1]   Rule 8(a) states in relevant part:

Two or more offenses may be charged in the same indictment
or information in a separate count for each offense if the
offenses charged, whether felonies or misdemeanors or both,
are of the same or similar character or are based on the
same act or transaction or on two or more acts or
transactions connected together or constituting parts of a
common scheme or plan.

FED. R. CRIM. P. 8(a).   The defendant has requested relief from
prejudicial joinder under FED. R. CRIM. P. 14.   She has not
requested the court to find the counts have been misjoined under
FED. R. CRIM. P. 8.

[2] Rule 14 provides in relevant part:

If it appears that a defendant or the government is
prejudiced by a joinder of offenses or of defendants in an
indictment or information or by such joinder for trial
together, the court may order an election or separate trials
of counts, grant a severance of defendants, or provide
whatever other relief justice requires.

FED. R. CRIM. P. 14

7

the defendant will be unfairly prejudiced by the joinder of

offenses.  See United States v. Yefsky, 994 F.2d 885, 895 (1ˢᵗ

Cir. 1993); FED. R. CRIM. P. 14.  In order to prevail on a motion

for relief from prejudicial joinder, a defendant must make a

"strong showing of prejudice."  United States v. Jordan, 112 F.3d

14, 16 (1ˢᵗ Cir. 1997), quoting United States v. Gray, 958 F.2d

9, 14 (1ˢᵗ Cir. 1992).  In other words, the defendant must

"present enough information . . . to satisfy the court that the

claim of prejudice is genuine."  See Yefsky, 994 F.2d at 896,

quoting United States v. Tracy, 989 F.2d 1279, 1284 (1ˢᵗ Cir.

1993).  The district court, however, retains a large degree of

discretion on the question of severance.  Yefsky, 994 F.2d at 897

(stating, "Rule 14 leaves the determination of the risk of

prejudice and any necessary remedy to the court's discretion.").

The First Circuit recognizes three types of prejudice that

may result from trying a defendant for several offenses during

the same trial: "(1) the defendant may become embarrassed or

confounded in presenting separate defenses; (2) proof that

defendant is guilty of one offense may be used to convict him of

a second offense, even though such proof would be inadmissable in

a second trial for the second offense; and (3) a defendant may

wish to testify in his own behalf on one of the offenses but not

another, forcing him to choose the unwanted alternative of testifying as to both or testifying as to neither." <u>United States v. Scivola</u>, 766 F.2d 37, 41-42 (1st Cir. 1985)(internal citations omitted); <u>United States v. Jordan</u>, 112 F.3d 14, 16 (1st Cir. 1997). Here, the unfair prejudice arises primarily, though not entirely, because evidence that the defendant was guilty of retaliation and obstruction may be improperly considered at a joint trial on the counts charging murder.

> ### 1. Evidence of One Offense Used to Convict on the Second Offense

Severance is appropriate when the evidence that would be presented at one trial would be inadmissable at the second trial. <u>See Scivola</u>, 766 F.2d at 41; <u>United States v. Diallo</u>, 29 F.3d 23, 28 (1st Cir. 1994). Stated in the alternative, "[i]f the evidence of each of the crimes would be admissable in a separate trial for the other, the possibility of criminal propensity prejudice would in no way be enlarged by the fact of joinder." <u>Drew v. United States</u>, 331 F.2d 85, 90 (D.C. Cir. 1964). To put this even more bluntly, if all the evidence is going to come in anyway, there is no point in a severance. Thus, in order to determine whether the defendant will be prejudiced by the joinder of Counts XIV and XV, it is necessary to decide whether the

evidence relating to those counts would be admissable in any event at the defendant's homicide and attempted homicide trial.

Evidence of the bomb threat to the VAMC and retaliation against witness Perrault constitutes "other crimes, wrongs, or acts," as defined by the Federal Rules of Evidence.[3]  Generally, 404(b) prohibits the use of prior bad acts to show the defendant has a "propensity towards criminal behavior."  United States v. Trenkler, 61 F.3d 45, 52 (1st Cir. 1995).  Such evidence may be admissable, however, to prove, among other things, motive, identity, knowledge, or consciousness of guilt.  See United States v. Stackpole, 811 F.2d 689, 694 (1st Cir. 1987).  The First Circuit has adopted a two-part test to determine the admissibility of Rule 404(b) evidence:

> First, the district court must determine whether the evidence has some 'special relevance' independent of its tendency simply to show criminal propensity. Second, if the evidence has 'special relevance' on a material issue, the court must then carefully conduct a Rule 403 analysis to determine if the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.

---

[3]  FED. R. EVID. 404(b) states in relevant part: Evidence of other crimes, wrongs, or acts, is not admissable to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissable for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

10

Trenkler, 61 F.3d at 52 citing United States v. Williams, 985

F.2d 634, 637 (1st Cir. 1993).

> a.   Special Relevance

The Government asserts that evidence of the bomb threat and

harassment of Perrault throws light on Gilbert's intent, motive,

and consciousness of guilt regarding her involvement in the

charged homicides, and would therefore be admissible under 404(b)

on the murder counts, even if Counts XIV and XV were severed.

See Government's Response to Defendant's Motion for Relief From

Prejudicial Joinder, Docket No. 184, at 3.   The Government has

cited numerous cases in which evidence of obstruction or

retaliation was admitted to demonstrate consciousness of guilt in

prosecutions for a wide variety of crimes.   It is of course true

that admission of such evidence is quite common and understand-

able.   The justification is obvious.   The fact that a defendant

is sufficiently desperate to commit crimes to disrupt an

investigation may be evidence that he or she is guilty of the

crime being investigated.

In the specific context of this case, however, while it is

true that evidence of the bomb threat and the harassment of

Perrault could conceivably have some probative value, the weight

11

of this evidence on the murder charges is doubtful. To give this
evidence proper effect a jury would have to conclude that
Gilbert, fearing the investigation, harassed Perrault in revenge
for his cooperation with law enforcement (and not because he had
ended their affair), and phoned in a bomb threat thinking that,
somehow, the resulting alarm would throw off the inquiry or
intimidate potential witnesses, even though she went to great
lengths to conceal the fact that she was the caller.  This is an
awful lot of squeezing for precious little juice.

The Government offers an additional justification for
admission of this evidence that is more troubling.  It argues
that the murders were committed by Gilbert because of "her
narcissism and need to attract attention to herself."
Government's Response to Defendant's Motion for Relief From
Prejudicial Joinder, Docket No. 184, at 8.  Since the retaliation
and bomb threat arguably exhibit these same qualities, the
argument runs, they may be considered by the jury in weighing the
evidence on the murder charges.  This, however, is merely
propensity evidence dressed up in another guise -- an attempt to
demonstrate "a trait of character . . . for the purpose of
proving action in conformity therewith on a particular occasion
. . . " explicitly forbidden by FED. R. EVID. 404(a).  Indeed, the

12

very risk that the jury will accept the evidence of the obstruction and retaliation as proof of defendant's vicious nature generally is the alarm that activates the Rule 404(b) analysis.

      b.    <u>Balancing Unfair Prejudice</u>

Acknowledging that the evidence underlying the obstruction and retaliation might have some probative value as evidence of intent or consciousness of guilt, the court must balance this probative value against potential unfair prejudice.  It has long been recognized that "[t]here is always a danger when several crimes are tried together, that the jury may use the evidence cumulatively; that is, that, although so much as would be admissable upon any one of the charges might not have persuaded them of the accused's guilt, the sum of it will convince them as to all."  <u>United States v. Halper</u>, 590 F.2d 422, 430-431 (2d Cir. 1978), quoting Hand, J., in <u>United States v. Lotch</u>, 102 F.2d 35, 36 (2d Cir. 1939); <u>see also</u> <u>United States v. Aguilar-Aranceta</u>, 58 F.3d 796, 800 (1ˢᵗ Cir. 1995); <u>United States v. Rodriguez-Estrada</u>, 877 F.2d 153, 155 (1ˢᵗ Cir. 1989).

The First Circuit has noted, however, that, "by design, all evidence is meant to be prejudicial; it is only unfair prejudice which must be avoided."  <u>Aguilar-Aranceta</u>, 58 F.3d at 800.  The

term "unfair prejudice," when applied to a criminal defendant,
"speaks to the capacity of some concededly relevant evidence to
lure the factfinder into declaring guilt on a ground different
from proof specific to the offense charged." United States v.
Rosario-Peralta, 199 F.3d 552, 561 (1st Cir. 1999) quoting Old
Chief v. United States, 519 U.S. 172, 180 (1997).  In determining
whether unfair prejudice exists, the district court has wide
discretion.  See Rosario-Peralta, 199 F.3d at 562, citing United
States v. Gilbert, 181 F.3d 152, 160-161 (1st Cir. 1999).

      In weighing probative value against unfair prejudice, the
court should keep in mind the following factors: "the
Government's need for the evidence; the strength of evidence
establishing the similarity of the two acts; the inflammatory
nature of the evidence, and the degree to which it would promote
an inference based solely on the defendant's criminal
propensity."  Trenkler, 61 F.3d at 56 (internal citations
omitted).

      Keeping these factors in mind, the court concludes that it
would be simply impossible in this case for any jury not to draw
damaging inferences regarding the defendant's character from the
evidence supporting Counts XIV and XV.  In fact, in large part,
the evidence underlying the retaliation and obstruction charges,

                          14

if it were applied to the murder counts, is precisely the kind of
character evidence that is prohibited by Fed. R. Evid. 404(a).
See Trenkler, 61 F.3d at 56 (stating, "[a]s with all 'bad act'
evidence, there is always some danger that the jury will use the
evidence not on the narrow point for which it is offered but
rather to infer that the defendant has a propensity towards
criminal behavior."); see also Old Chief, 519 U.S. at 179
(stating "[a]lthough propensity evidence is relevant, the risk
that the jury . . . uncertain of guilt, will convict anyway
because a bad person deserves punishment —creates a prejudicial
effect that outweighs ordinary relevance." (internal citations
omitted)).

     The tape recordings of the bomb threats and other harassing
phone calls, featured in the previous trial, consist of graphic
language, violent threats, and eery, intimidating voice
transformations.  Moreover, trial and defense of the retaliation
charge would require a thorough airing of all the dirty linen
related to Gilbert's affair with Perrault, including her
abandonment of her husband and children, her divorce, and the
details of this tempestuous liaison.  Because all this evidence
is so inflammatory, the jury would find it impossible to limit it
solely to the issue of Gilbert's consciousness of guilt.  See

Rosario-Perralta, 199 F.3d at 562 quoting Old Chief, 519 U.S., at
180 (stating "[u]nfair prejudice within its context means an
undue tendency to suggest decision on an improper basis,
commonly, though not necessarily, an emotional one"); United
States v. Frankhauser, 80 F.3d 641, 648-49 (1st Cir.
1996)(warning that "[t]he trial judge . . . must weigh the
special relevance against the prejudicial risk, taking into
account the likely hostile jury reaction . . .).

        In addition, evidence of the telephone bomb threat would
inevitably lead the jury to draw an inference of the defendant's
criminal propensity.  The jury could never resist the temptation
to conclude that someone who had forced the evacuation of dozens
of patients from an intensive care ward would necessarily be
quite capable of committing homicide within the same population.
See Aguilar-Aranceta, 58 F.3d at 801 (stating, "[h]ere, we cannot
escape the conclusion that the most powerful inference that the
jury was likely to make from the prior conviction is also the
forbidden one: that because she was previously convicted under
nearly identical circumstances, she must be guilty here.").  The
danger that this evidence would lead the jury to infer criminal
propensity is so great in this case that, whatever limited
probative value the evidence retains, it is substantially

                                16

outweighed by the unfair prejudicial effect on the defendant.

Indeed, weighed against the dramatic tendency to engender unfair prejudice, the minimal legitimate probative value of the obstruction and retaliation evidence in the murder counts is virtually nil.  The balance on this point powerfully favors the defendant.

Because the evidence of obstruction of justice and retaliation would not be admissible at a separate trial under FED. R. EVID. 404(b) and 403,[4] the joinder of Counts XIV and XV is unfairly prejudicial under the Scivola test.

### 2.   Confounded Defenses

In addition to the problem of the jury drawing improper inferences about the defendant's character, the defendant would be prejudiced by joinder in another less compelling but still significant way.  The First Circuit has recognized unfair prejudice if the defendant may become "embarrassed" or confounded in presenting defenses to all the joined offenses.  See Scivola 766 F.2d at 41-42 (citing Drew v. United States, 331 F.2d 85 as

_____

[4] FED. R. EVID. 403 states:
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

defining "embarrassed or confounded" as the need to present
confusing or conflicting defense tactics).

As defense counsel notes, a joint trial with the obstruction
and retaliation counts will force Gilbert to present an
alternative defense that will conflict with her defense to the
homicide and attempted homicide charges.  She will have to
present evidence of her tumultuous relationship with Perrault,
and the accompanying jealousy and anger, as the true underlying
reason for her behavior.  A portrayal of the defendant as the
out-of-control victim of a blighted romance is likely to weaken
her defense on the murder charges, leaving counsel with the
Hobson's choice of defending Gilbert vigorously on the
obstruction and retaliation charges -- with the risk of
offending, or confusing, the jury -- or conceding conviction on
these relatively minor charges to focus on the murder defense.

In sum, in moving for severance under Rule 14, the defendant
has made a "strong showing of prejudice."  The motion will
therefore be allowed, Counts XIV and XV will be severed, and the
Government will be prohibited from offering evidence of the bomb
threat or the retaliation against Perrault at the trial of Counts

18

I through XIII.[5]

B.   <u>Motion to Dismiss Count XV</u>

It is premature to assess the sufficiency of the Government's evidence on Count XV.  The motion to dismiss this count will therefore be denied, without prejudice.

IV.   <u>CONCLUSION</u>

For the above reasons, defendant's Motion for Relief from Prejudicial Joinder of Counts XIV and XV (Docket No. 157) is ALLOWED and the defendant's Motion to Dismiss Count XV of the Superceding Indictment (Docket No. 175) is DENIED, without prejudice.

A separate order will issue.

_____
MICHAEL A. PONSOR
U. S. District Judge

_____

[5]   This evidentiary ruling is made, of course, with the proviso that it may be reconsidered at trial if cross examination opens the issue up.